# THE GERMAN-AMERICAN INSURANCE COMPANY

## *v.*

## CHARLES F. STEIGER.

### *Filed at Springfield March 26, 1884.*

1. INSURANCE—*of an appraisement in case of loss—whether necessary—and whether there must be a request.* Where a policy of insurance against loss by fire provides that "loss or damage to property totally or partially destroyed, unless the amount of such loss or damage is agreed upon between the assured and the company, shall, at the written request of either party, be appraised and determined by disinterested and competent persons," etc., no appraisal and award of the loss or damage are essential to a recovery for the same unless a written request of one of the parties is first made. Such request is a condition precedent to such appraisal and award.

2. SAME—*increase of risk—evidence in respect thereto.* In a suit on a policy of insurance to recover for a loss by fire of buildings and machinery used for the manufacture of hominy and meal, in which an increase of the risk was set up in defence, caused by the substitution of a fire-dryer instead of a steam-dryer without permission of the insurer, the court permitted witnesses for the plaintiff to testify to the circumstances of the actual use of the fire-dryer: *Held,* that the evidence was admissible upon the strict question of increase of risk, as showing whether the fire-dryer, as constructed and as used and managed, increased the risk.

3. On the question whether the substitution of a fire-dryer in lieu of a steam-dryer in buildings used for the manufacture of hominy increased the risk of the insurer, the policy being silent as to the kind of a dryer to be used, when the court has received in evidence all facts tending to show an increase of risk, and the witness' opinions on the question, with their reasons, there is no error in refusing to admit evidence of the customary method of drying, or that the risk is uninsurable after the introduction of a fire-dryer.

4. A fire-dryer for drying hominy will be considered as embracing its appurtenances, and its mode of use in connection with the works as constructed may be taken into view as bearing upon the question of the increase of the risk by its employment in the place of a steam-dryer.

5. SAME—*running a mill extra hours.* Where a policy of insurance of a mill for the manufacture of hominy has fixed no hours for regularly running the mill, and no question was asked or answered in the application as to how many hours it was to be run each day, it was *held,* no error to refuse an instruction that if the jury believed, from the evidence, that the plaintiff's lessees had run the mill over or extra hours, such fact would defeat a recovery upon the policy.

6. APPEAL—*reviewing facts.* Whether the substitution of a fire-dryer instead of a steam-dryer in buildings used for the manufacture of hominy increased the risk of an insurance company or not, is a question of fact, not reviewable by this court when the finding in the trial court is affirmed in the Appellate Court in an action on a policy of insurance.

APPEAL from the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of Sangamon county; the Hon. CHARLES S. ZANE, Judge, presiding.

Messrs. PALMERS, ROBINSON & SHUTT, for the appellant.

Messrs. BRADLEY & BRADLEY, for the appellee.

Mr. CHIEF JUSTICE SHELDON delivered the opinion of the Court:

This was an action to recover the amount of a policy of insurance against fire, dated October 5, 1881, for one year. The insurance was, $750 on the brick hominy mill of the assured; $1000 on his hominy mill machinery; $250 on his frame warehouse, situated forty feet from the mill. On April 16, 1882, the property was destroyed by fire. Proofs of loss were forwarded to the insurance company on the 12th of April, 1882, and on July 18, 1882, the suit was brought, resulting, in the circuit court, in a verdict and judgment for the plaintiff for $2070. On appeal to the Appellate Court for the Third District the judgment was affirmed, and defendant appealed to this court.

The first question made is upon the want of an award of appraisers of the damage. It is raised upon objection to the sufficiency of the proofs in not containing such award, and to the refusal of an instruction asserting the necessity of the award. The conditions of the policy upon the subject of an appraisal and award are as follows:

"Loss or damage to property totally or partially destroyed, unless the amount of said loss or damage is agreed upon

between the assured and the company, shall, at the written request of either party, be appraised and determined by disinterested and competent persons, one to be selected by this company and one by the assured; and where either party demands it, the two so chosen may select an umpire to act with them in case of disagreement; and if the said appraisers fail to agree, they shall refer the differences to such umpire, each party to pay their own appraiser and half of the umpire's fee, and the award of any two, in writing, shall be binding and conclusive as to the amount of such loss or damage; but no appraisal, nor agreement for appraisal, shall be construed, under any circumstances, as evidence of the validity of said policy, or of the company's liability thereon. The award of the appraisers, in writing, under oath, shall form a part of the proofs hereby required, and until such proofs and certificates are produced, examinations permitted and appraisal is had, the loss shall not be payable. * * * It is expressly covenanted by the parties hereto, that no suit or action against this company, for the recovery of any claim by virtue of this policy, shall be sustainable in any court of law or chancery until after an award shall have been obtained, fixing the amount of such claim in the manner above provided. * * * And it is further expressly covenanted by the parties hereto, that no officer, agent or representative of this company shall be held to have waived any of the terms and conditions of this policy, unless such waiver shall be indorsed hereon in writing."

Without dwelling upon the fact of no objection having been made to the proofs which were furnished, as estopping the company from afterward objecting thereto when sued on its policy for the loss, we are of opinion that, reading all the above conditions together, the appraisal and award which were contemplated were to be at the written request of one of the parties,—that such written request was a condition precedent to such appraisal and award,—and that there not

having been here a written request by either party for an appraisal, an appraisal and award were not necessary, under the conditions, in order to entitle the plaintiff to a recovery.

The most serious matter of contest in the case is in the respect of an increase of the risk by the use of a fire-dryer instead of a steam-dryer. One of the conditions of the policy is: "Or if the risk be increased, by any means, without the consent of this company written hereon, this policy shall be void." It appears that the use of a dryer of some kind is a necessary part of or incident to a hominy mill in the manufacture of hominy, meal, etc., to prepare the product for market. At the time this property was insured there was in use in the mill what is known as a "steam-dryer," which was supplied with heat by steam, conducted through metal pipes, from a boiler in the engine house, situated some distance away, to the place of drying. The fire which generated this steam was in the engine house, and was the same fire used in producing steam to propel the machinery of the mill. A short time before the fire plaintiff introduced and employed what is called a "fire-dryer." The process of drying by this machine was to pass the product of the mill directly into and through a cylinder heated by a coal fire, or what is called "fire heat." For the purpose of this dryer, adjoining to one side of the main building, a wooden shed was constructed, and a stove-pipe run up through the roof, and in this shed the works for drying by the application of fire heat were placed and operated. If there was any error committed in not sustaining this defence of an increase of risk from the substitution of the fire-dryer for the steam-dryer, it was one of fact, in not finding that such substitution increased the risk. With that this court has nothing to do. It must rest with the decision of the Appellate Court. We discover no error of law which should reverse the judgment, in the submitting of the question of increase of risk to the jury for decision.

Errors are complained of in the admission and rejection of evidence. Witnesses on the part of the plaintiff were permitted, against the objection of defendant, to testify to the circumstances of the actual use of the fire-dryer. It is objected to this that the effect of the admission of the evidence was to mislead the jury as to the true question for them to consider, and make them think it to be whether there was proper care and management in the use of the dryer, instead of whether it increased the risk. We think the evidence was admissible upon the strict question of increase of risk, as showing whether the fire-dryer, as constructed, and as used and managed, increased the risk. If the jury were liable to be misled in the respect named, and think, from such evidence, that proper care and management would suffice even if there was an increase of risk, they might have been cautioned against that, as they seem to have been, fully, by instructions asked by the defendant.

The witness Smith, State agent of the North British Insurance Company, and who had for many years been doing the work of State agent, inspecting risks, adjusting losses, and supervising agencies, after having testified that there was always some drying process of the corn and meal in connection with a hominy mill, and that there was a custom as to the method of drying, was asked by defendant, "What is that method?" On objection, the court excluded the question, counsel for defendant stating that he proposed to prove that there was a customary method of drying the product, and that this method was not adopted in this case. The policy is entirely silent as to the kind of dryer to be used,— whether a steam-dryer or a fire-dryer, and as to the customary method of drying, containing nothing whatever upon the subject of the drying process. The customary method of drying was not in issue before the jury. The customary method is not seen to have any necessary reference to safety from fire. It may stand recommended in its use by other considerations.

Exception was taken to the exclusion of the offer of testimony, by this same witness, that the risk, after the introduction of the fire-dryer, was uninsurable. The witness had before testified, that in his own opinion there was an increase of the risk by the use of the fire-dryer, giving his reasons therefor. Like testimony of other witnesses on behalf of defendant was given, without objection. Testimony further, that the additional risk was uninsurable, would seem to be but evidence of the opinion of insurance companies, derived from their conduct. The issue was, was the risk increased? All facts tending to show an increase of risk, the witness' own opinions on the question, with their reasons, were received in evidence, and so long as there was the full admission of such testimony, we find no reasonable ground of complaint in the exclusion of evidence of the customary method of drying, or that the risk was uninsurable after the introduction of the fire-dryer.

The court gave this instruction for the plaintiff:

"The court instructs the jury, that the question of whether there was an increase of risk or hazard by the use or occupancy of the property insured in the policy in suit, is one of fact, for the jury to determine, from all the evidence in the case, and if they believe, from the evidence, that there was no increase of risk or hazard, then the fact of a fire-dryer having been used in connection with the property insured would not be a violation of the conditions of the policy in this regard."

It is complained that the jury are told by this instruction that if they believe, from the evidence, that the risk of fire was not increased by the fire-dryer *as used* in connection with the property insured, then there was no breach of the condition of the policy in respect to the increase of the risk. We do not regard the instruction as subject to this criticism made upon it. But if it were, we could not hold it to be erroneous,

under the view we have expressed upon the admissibility of evidence as to the care exercised in the use and management of the fire-dryer. Of course, we understand the fire-dryer as embracing its appurtenances, and hold that its mode of use in connection with the works, as constructed, may be taken into view as bearing upon the increase of the risk by the fire-dryer.

An instruction was asked by the defendant, and refused, that if the jury believed, from the evidence, that the plaintiff's lessees had run over or extra hours, that such fact would avoid the policy. The policy contained a condition that "if the premises, being a mill or manufactory, shall run over or extra hours, * * * this policy shall be void." All the evidence whatever touching this subject was: "The mill was run every day from seven to six, five days in the week, and from seven till five on Saturdays. We were running all night during January and February, and a portion of December; don't think we run nights any in April; think we quit in February." The policy fixed no hours for regularly running the mill. No written application was made by the assured, and no questions asked or answered as to how many hours the mill was running each day, when the policy was issued, nor was there any statement in the policy that regular hours would be any particular hours. The policy contained nothing whatever upon the subject, beyond the bare condition above. Over or extra hours might have reference to the number of hours the mill was running at the time of the issuance of the policy, but that would be merely conjectural. In the absence of the policy containing any standard of determination of what were, or not, over or extra hours, we must consider this provision as without meaning, and that there was no error in refusing the instruction.

The judgment of the Appellate Court must be affirmed.

*Judgment affirmed.*